UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PAYNES CRANES, INC., and CERTAIN
UNDERWRITERS AT LLOYD'S, LONDON,
subscribing to Policy No. SRSGLNY06126,   **MEMORANDUM & ORDER**
                                           12-CV-3497 (RRM) (JO)
         Plaintiffs,

   - against -

AMERICAN STATES INSURANCE COMPANY,

         Defendant.
------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

     In this action, plaintiffs Paynes Cranes, Inc. ("Paynes") and its insurer, Certain Underwriters at Lloyd's, London, seek a declaration that defendant, American States Insurance Company ("American"), must defend and, if necessary, indemnify Paynes in a personal injury suit pending in state court. American removed the case to this Court on July 16, 2012, and the parties cross-moved for summary judgment on August 5, 2013. (*See* Doc. Nos. 32–42, 43.) Since these cross-motions address the same issues, the Court addresses both in this Memorandum and Order. For the reasons explained below, both motions are denied.

## BACKGROUND[1]

     As its name implies, Paynes supplies cranes for construction projects. In August 2007, a company called Intermetal Fabricators, Inc. ("Intermetal"), hired Paynes to provide a crane for

---

[1] At this stage, the evidence of a nonmovant "is to be believed" and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004). Accordingly, the Court considers the facts in the light most favorable to the non-moving party as to each claim, drawing all reasonable inferences in that party's favor. *See Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002).

the construction of a store in Oneonta, New York.[2] Paynes did so, supplying both the crane and an employee to operate it. On or about August 17, 2007, one of the construction workers on the project was injured while working with the crane. The injured worker sued several defendants – including Paynes – in a state personal injury action.[3] In this case, Paynes seeks a judicial declaration that American, which insured Intermetal during the relevant period, must defend and, if necessary, indemnify Paynes in the suit brought by the injured worker.[4]

The central issue in this case, of course, is whether the insurance policy American provided to Intermetal also covers Paynes.[5] But that relatively straightforward inquiry is complicated here by the language of the provision under which Paynes claims coverage. Because the policy does not explicitly list Paynes as an insured party, the issue of coverage turns on whether Paynes qualifies as an "Additional Insured" under the policy's terms.[6] In relevant part, the policy provided that:

> Any person or organization . . . for whom you [Intermetal] are required by written contract, agreement or permit to provide insurance is an insured, subject to the following additional provisions:
>
> a. The contract, agreement or permit must be in effect during the policy period . . . and must have been executed prior to the "bodily injury," "property damage," "personal and advertising injury."

---

[2] Intermetal, a steel fabrication company, was itself retained to erect the store by DDM Construction Company. (Decl. of Pat Degliuomini ("Degliuomini Decl.") (Doc. No. 43-2) ¶¶ 4–5.)

[3] According to the parties, that action, captioned *Francisco Barrios v. Southside Mall L.L.C. et al.*, is currently pending in the Supreme Court for the State of New York, Kings County.

[4] Paynes and its insurer also seek to recover the costs incurred to bring this action, should the Court find that plaintiffs are entitled to relief. (*See* Notice of Removal (Doc. No. 1) at 8 (ECF Pagination).)

[5] As an initial matter, the parties agree that New York law controls in this case. Moreover, American is not prevented from defending this action by a failure to issue a timely disclaimer under N.Y. Ins. Law § 3420(d), because a "denial of coverage . . . based on lack of coverage pursuant to [an] additional insured endorsement" does not require a "timely disclaimer." *B.R. Fries & Associates, LLC v. Illinois Union Ins. Co.*, 934 N.Y.S.2d 10, 11 (N.Y. App. Div. 2011); *see also Albert J. Schiff Associates, Inc. v. Flack*, 417 N.E.2d 84, 88 (N.Y. 1980) (stating that the "defense of noncoverage . . . is never waived by a failure to assert it in a notice of disclaimer").

[6] This is one of the few points on which the parties are in agreement. (*See, e.g.*, Def.'s 56.1 Stmt. (Doc. No. 43-16) ¶ 6; Pls.' 56.1(b) Stmt. (Doc. No. 43-26) ¶ 6.)

2

(Decl. of Richard H. Yaus ("Yaus Decl.") (Doc. No. 43-5), Ex. 1 at 48 (ECF Pagination).) The crux of the parties' dispute is whether, within the meaning of this provision, a written contract existed between Paynes and Intermetal prior to the injured worker's accident. Paynes argues that there was a contract because, at the end of each day that Paynes provided a crane for the project, an agent of Intermetal signed a "job ticket" presented by Paynes that provided, in pertinent part, the following on its reverse side:

> 1. PARTIAL INDEMIFICATION – Lessee [Intermetal] agrees to partially indemnify and save lessor [Paynes], its employees and agents harmless from claims for death or injury to persons, including lessor's employees, of loss, damage or injury to property, including the equipment, arising in any manner out of lessee's operation.
>
> [...]
>
> 2. INSURANCE – The lessee agrees to purchase the following insurance coverages prior to the equipment's arrival on the job site. The lessee shall purchase the following coverages for lessor: a.) worker's compensation and employer's liability insurance, with limits of at least the statutory minimum or $1,000,000, whichever is greater; b.) primary non-contributory commercial general liability insurance on an occurrence basis, including bodily injury and property damage coverage with minimum limits of $1,000,000 per occurrence and $2,000,000, in the aggregate; c.) excess/umbrella non-contributory insurance in the amount of $5,000,000 . . . . f.) the lessor and all affiliated partnerships, joint ventures, corporations, and anyone else who lessor is required to name as an additional insured, are to be included as additional insureds on all liability insurance policies, including excess/umbrella policies . . . . To the extent that the lessee may perform under this lease without obtaining the above coverages, such an occurrence shall not operate, in any way, as a waiver of the lessor's right to maintain any breach of contract action against the lessee.

(Yaus Decl., Ex. 7 (Doc. No. 43-11) at 5 (ECF Pagination).) Notably, although each ticket had two spaces for signatures clearly labelled "HAVE SIGNED AT START OF JOB" and "HAVE SIGNED AT END OF DAY," the tickets were signed only once in the latter space at the end of each work day. Additionally, all other information reflected on the signed tickets – including the

3

equipment rented, the date and time it arrived, and the cost of the rental – was inserted by Paynes' personnel subsequent to the ticket being signed.

American argues that its policy does not cover Paynes because the job tickets did not create a contract between Intermetal and Paynes. Specifically, American argues that the job tickets did not create a valid contract because the person who signed the job tickets lacked the authority to enter into any contractual agreement on behalf of Intermetal. American also urges that any such contract would be void because the job tickets did not state the price on which the parties agreed at the time they were signed.

## DISCUSSION

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine disputes of material fact and one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may also be granted "if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [his or her] case" where "the nonmoving party bears the burden of proof at trial." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted). To defeat a motion for summary judgment, a nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor," *Anderson*, 477 U.S. at 256, beyond "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

Viewing the evidence in the light most favorable to the respective nonmoving parties and drawing all reasonable inferences in each nonmovant's favor, genuine factual disputes preclude summary judgment on either motion in this case. *See Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247–48). At the outset, the Court notes that each party devotes a substantial portion of its brief to the perceived reasonableness (or unreasonableness) of its adversary's characterizations of the record evidence. But "[l]ike all legal issues that require determinations of 'reasonableness,' the issue is one of degree." *Mowers v. Paul Revere Life Ins. Co.*, 204 F.3d 372, 376 (2d Cir. 2000). Although courts police the outer bounds of reasonableness determinations, "unless under the circumstances jurors could not reasonably differ," reasonableness is a question for a trier of fact. *Id.* at 375. The parties also reference practices supposedly standard in their industry to buttress their positions. Similarly, however, "[s]ummary judgment is ordinarily inappropriate where extrinsic evidence such as industry custom and practice are at issue." *Graffman v. Delecea*, No. 96-CV-7270 (SWK), 1997 WL 620833, at *4 (S.D.N.Y. Oct. 8, 1997) (citing *Christiania Gen. Ins. Corp. of New York v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992)).

In any event, the parties have also adduced conflicting evidence on several material issues. The crucial question in this case is whether Mario Marroquin, the Intermetal employee who signed Paynes' job tickets, had the requisite authority to bind Intermetal to a contract. Both parties agree on the law governing that inquiry. Briefly, "[i]t is well settled under New York law that an agent may bind his principal when he has actual or apparent authority." *Merrill Lynch Capital Servs., Inc. v. UISA Fin.*, No. 09-CV-2324 (RJS), 2012 WL 1202034, at *6 (S.D.N.Y. Apr. 10, 2012), *aff'd*, 531 F. App'x 141 (2d Cir. 2013). Actual authority exists where "the principal has granted the agent the power to enter into contracts on the principal's behalf, subject

5

to whatever limitations the principal places on this power, either explicitly or implicitly." *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) (citing *Ford v. Unity Hosp.*, 299 N.E.2d 659 (N.Y. 1973)). Alternatively, an agent may have apparent authority if "the principal was responsible for the appearance of authority in the agent to conduct the transaction in question" and a third party "reasonably relied on the representations of the agent." *Herbert Const. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 993–94 (2d Cir. 1991) (citing *Ford,* 299 N.E.2d at 664; *Hallock v. State*, 474 N.E. 2d 1178, 1181 (N.Y. 1984)) (internal quotation and citations omitted).

While the parties do not differ on the applicable legal principles, they agree on little else. American argues that Marroquin possessed neither actual nor apparent authority to contract for Intermetal, pointing to evidence that Pat Degliuomini, Intermetal's Manager, never authorized Marroquin to contract on behalf of Intermetal and that Degliuomini did not expect Marroquin to do so.[7] Paynes, on the other hand, argues that Marroquin *was* authorized to contract for Intermetal, and cites evidence that Degliuomini put Marroquin in charge of overseeing the project and charged Marroquin with the responsibility to direct Intermetal's personnel.[8] Paynes also argues that even if Marroquin did not have actual authority to sign the contracts, both

---

[7] For instance, Degliuomini declares that he did not authorize Marroquin to do anything beyond "supervis[e] employees in their construction work" and "sign a receipt acknowledging that Intermetal received equipment or returned equipment." (Degliuomini Decl. ¶ 10.) He also avers that Marroquin "was not authorized to sign contracts on behalf of Intermetal," "enter into subcontracts or any types of contracts on behalf of Intermetal," or "bind Intermetal to . . . the indemnity and insurance agreements that Paynes asserts exist." (*Id.* ¶ 11–12.) And Degliuomini states that "[n]o one at Intermetal ever told or indicated to Mr. Marroquin that he was authorized to enter into contracts on behalf of Intermetal." (*Id.* ¶ 15.)

[8] On this score, Paynes cites testimony by Degliuomini that Intermetal was expected to obtain a crane for the project; that Marroquin was authorized to sign certain limited documents on behalf of Intermetal, *e.g.*, for deliveries of materials and the time records for the crane; that Degliuomini hired Marroquin to "be responsible for the guys" and to "direct all the men" at the worksite; and that Degliuomini never actually discussed with Marroquin whether Marroquin had the authority to sign agreements on behalf of Intermetal. (*See* Decl. of James Freire ("Freire Decl."), Ex. F (Doc. No. 43-23) at 7, 10, 13–14, 23–26 (ECF Pagination).)

Marroquin and Fred Schoelier, Paynes' crane operator, were entitled to conclude that Marroquin had sufficient authority to sign the alleged contract.[9]

On summary judgment, the Court's role "is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997). If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997). Such evidence is present here. Although "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation," *Ford*, 299 N.E. 2d at 664, an agent may derive implied authority from "manifestations which, though indirect, would support a reasonable inference of an intent to confer such authority." *Greene v. Hellman*, 412 N.E. 2d 1301, 1305 (N.Y. 1980). "Reliance on implied authority is acceptable so long as it is reasonable from the circumstances surrounding the transaction." *Graffman*, 1997 WL 620833, at *4 (citing *99 Commercial Street, Inc. v. Goldberg*, 811 F. Supp. 900, 906 (S.D.N.Y. 1993)). It may well be that Marroquin lacked any express or implied authority to contract, but to the extent that determination relies on weighing reasonableness in the specific circumstances or under customs in the industry, it is one for the trier of fact.

---

[9] Here, Paynes offers testimony from Schoelier's deposition, in which he stated that Marroquin identified himself to Schoelier as the person in charge at the site and directed Schoelier's work. (*See* Freire Decl, Ex. E (Doc. No. 43-22) at 7–8, 22–26 (ECF Pagination).) And although there is evidence that Degliuomini understood Marroquin's authority to extend only to very limited situations, (*see, e.g.*, *id.*, Ex. F at 25–26), American does not offer evidence that Degliuomini explicitly limited Marroquin's authority in that way. Rather, Degliuomini stated that his knowledge of what Marroquin could sign was based on the custom in the industry. (*See id.* at 27.) Degliuomini also testified that his agreement with Marroquin was oral and not witnessed by any other individuals. (*Id.* at 12.) Absent some definite expression of Marroquin's authority, questions as to the scope of that authority are for a trier of fact. *See, e.g.*, *Fogel v. Hertz Int'l, Ltd.*, 529 N.Y.S. 2d 484, 485 (N.Y. App. Div. 1988) (stating that "where . . . circumstances raise the possibility of a principal-agent relationship but no written authority of the agent has been proven, questions of agency and of its nature and scope are questions of fact to be submitted to the jury") (internal quotation marks omitted). On this record, the scope of whatever authority Marroquin held is a factual question that precludes summary judgment.

Moreover, even if Marroquin lacked actual authority, questions of fact exist as to whether he could bind Intermetal under the doctrine of apparent authority. *Cf. Marine Midland Bank, N.A. v. Fairwood Associates*, 503 N.Y.S. 2d 920, 921–22 (N.Y. App. Div. 1986). Marroquin could not "by his own acts imbue himself with apparent authority," *Hallock*, 474 N.E. 2d at 1181, but a jury could reasonably conclude that Schoelier reasonably believed that Marroquin could sign the contract after observing the authority and responsibilities Degliuomini had given Marroquin. *Cf. Ford*, 299 N.E. 2d at 664. "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 289 (2d Cir. 2003) (quoting *Minskoff v. Am. Exp. Travel Related Servs. Co., Inc.*, 98 F.3d 703, 708 (2d Cir. 1996)); *see also Kirschner v. KPMG LLP*, 938 N.E. 2d 941, 964 (N.Y. 2010).

Additionally, other disputes of material fact exist as to Marroquin's contractual intent at the time he signed the job tickets,[10] whether the alleged contract is rendered invalid by a failure to include a material term,[11] and whether the circumstances of this transaction gave rise to a duty

---

[10] Paynes produced copies of the signed job tickets, (*see* Freire Decl, Ex. D (Doc. No. 43-21)), but American asserts that "there is no evidence that Marroquin thought or believed he was signing a contract," (Def.'s Reply Mem. (Doc. No. 43-33) at 6–7 n.5), citing Schoelier's testimony that he never discussed the contract language with Marroquin and pointing out that Marroquin left blank the space labeled "Customer/Lessee." (Freire Decl, Ex. E at 12 (ECF Pagination)); *id.*, Ex. D.) However, "the issue of whether or not the parties ever came to a meeting of the minds so as to have entered into an enforceable agreement should properly be left to the determination of the trier of the facts." *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 567 N.Y.S. 2d 404, 408 (N.Y. App. Div. 1991).

[11] American maintains that even if the job tickets are contracts, they are invalid because they lack a definite price term. But "a price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 548 N.E. 2d 203 (N.Y. 1989). Rather, the absent term "may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties" through, for example, "reference to an extrinsic event, commercial practice or trade usage." *Id.* Paynes cites evidence that John Payne, Paynes' president, "probably" discussed price with Intermetal prior to providing any equipment. (Freire Decl, Ex. B (Doc. No. 43-19) at 6 (ECF Pagination).) Paynes also offers a declaration from Phillip Darling, Paynes' office manager and bookkeeper, which states that the price entries on the tickets were intentionally left blank because a final price could "only be determined once the total number of hours of the rental [wa]s established." (*Id.*, Ex. C (Doc. No. 43-20) ¶ 4.) Darling further declared that he received the signed tickets from Schoelier, calculated the total hours, inserted the final cost, and forwarded the tickets to Intermetal. (*Id.* ¶¶ 8–9.) American denies that. (Degliuomini Decl. (Doc. No. 43-2) ¶ 14; Decl. of Deborah Pallone (Doc. No. 43-3) ¶¶ 3–4.)

of inquiry on behalf of Paynes.[12] Resolving those conflicts will require "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence," which, too, "are matters for the jury, not for [a] court on a motion for summary judgment." *Fischl*, 128 F.3d at 55. Given the evidence adduced by the parties, the Court concludes that summary judgment must be denied.

## CONCLUSION

The parties cross-motions reveal significant factual disagreements on material issues, the resolution of which will require credibility judgments and the careful weighing of evidence thus. Those determinations are the province of a trier of fact, and preclude summary judgment. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322. Accordingly, the parties' cross-motions are denied.

This matter is recommitted to Magistrate Judge James Orenstein for supervision of all remaining pretrial matters, including the preparation of a Joint Pre-Trial Order and any settlement discussions as appropriate

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
       March 26, 2014

ROSLYNN R. MAUSKOPF
United States District Judge

---

[12] "When facts and circumstances serve to put [a] third party on notice that [an] agent may not be authorized to represent the principal, the third party has a duty to inquire as to the scope of the purported authority." *Arol Dev. Corp. v. Whitman & Ransom*, 626 N.Y.S. 2d 118, 120 (N.Y. App. Div. 1995). Although the record is clear that Schoelier did not attempt to investigate the extent of Marroquin's authority, it is not manifest – at least for the purposes of summary judgment – that such an inquiry was required.